**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1811-14T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ANTHONY C. RIDGEWAY,
a/k/a ANTHONY RIDGEWAY,

    Defendant-Appellant.

_____

> Submitted March 14, 2017 — Decided December 5, 2017
>
> Before Judges Fisher, Leone, and Vernoia.
>
> On appeal from Superior Court of New Jersey,
> Law Division, Cumberland County, Indictment
> No. 11-08-0713.
>
> Joseph E. Krakora, Public Defender, attorney
> for appellant (Rochelle Watson, Assistant
> Deputy Public Defender, of counsel and on the
> brief).
>
> Jennifer Webb-McRae, Cumberland County
> Prosecutor, attorney for respondent (Stephen
> C. Sayer, Assistant Prosecutor, of counsel and
> on the brief).

    The opinion of the court was delivered by

LEONE, J.A.D.

Defendant Anthony C. Ridgeway appeals his judgment of conviction. We remand for a hearing on a juror's impartiality. Subject to the outcome of that hearing, we affirm defendant's convictions. We vacate the consecutive nature of the sentence and remand for resentencing.

I.

Defendant was prosecuted for killing Tara Valentin in the wee hours of September 24, 2010. She was found shot in the eye with a small-caliber weapon at close range at her home in a Fairfield Township trailer park.

At trial, the State called Terri Wright, who also lived at the trailer park. She testified as follows. Around midnight she saw defendant with a gun. She overheard him on his cell phone trying to sell the gun around 2:00 a.m. He left but returned to Wright's trailer and threw down the gun around 4:30 a.m. Wright admitted to involvement with drugs, namely cocaine and marijuana. She testified she had a couple beers that night, and admitted using cocaine between defendant's departure time and his return.

The State also called co-defendant Matthew Allison, whose phone records showed he was phoned by defendant around 3:30 a.m. He testified as follows. Defendant phoned Allison and told Allison he purchased a .22 caliber gun and asked if Allison could help

sell it. After they unsuccessfully tried to sell the gun over the phone, they tried to sell it to Valentin, a drug dealer. Defendant showed the gun to her. Allison said Valentin "got ignorant with us" and said something like "[g]et it out of my face" or "I don't want that piece of shit."

Allison testified that as he and defendant walked away, they decided to go back and take Valentin's drugs and money because they had been insulted by her. Allison testified that they decided that defendant "was going to just point the gun at her and [Allison] was going to go in a bedroom and take the drugs."

Allison testified he and defendant entered Valentin's trailer, where Valentin was lying on the couch. Defendant pointed the gun at her and said: "I want everything. I want all the drugs." Valentin stood up and went to grab the gun. She barely touched the barrel when defendant tried to pull the gun back and it fired. Allison grabbed some pills he saw on the coffee table, and broke the window so it would look like a break-in. Allison and defendant ran back to defendant's trailer.

The State also called Rodger Barrick, defendant's uncle, who testified that on the afternoon of September 24, defendant arrived at the house of Barrick's girlfriend, asked to stay the night, and told Barrick he accidentally shot a person when the person "kicked the gun," causing it to go off. That evening, the police found

defendant in the attic of the house and arrested him. Barrick testified he was "a drinking man," he drank some beers when defendant confessed to him, and he drank "[q]uite a bit" that day or the night before.

A jury acquitted defendant of first-degree felony murder, but found him guilty of first-degree aggravated manslaughter, <u>N.J.S.A.</u> 2C:11-4(a)(1); first-degree armed robbery, <u>N.J.S.A.</u> 2C:15-1(a)(1) and (2); second-degree burglary, <u>N.J.S.A.</u> 2C:18-2(b)(1); second-degree possession of a weapon for an unlawful purpose, <u>N.J.S.A.</u> 2C:39-4(a); second-degree unlawful possession of a weapon, <u>N.J.S.A.</u> 2C:39-5(b); and second-degree certain persons not to have firearms, <u>N.J.S.A.</u> 2C:39-7(b). The trial court imposed an aggregate prison sentence of forty-six years with 85% to be served without parole under the No Early Relief Act (NERA), <u>N.J.S.A.</u> 2C:43-7.2.

Defendant appeals his June 19, 2014 judgment of conviction. He argues:

> POINT I - DEFENDANT WAS DEPRIVED OF HIS RIGHT TO A FAIR TRIAL BECAUSE THE TRIAL COURT FAILED TO ENSURE THAT JURORS EXPOSED TO COMPROMISING (sic) MATERIAL, IN TWO SEPARATE INCIDENTS, COULD DELIBERATE IMPARTIALLY.
>
> > A. WHERE THE PROSECUTOR'S CASE AGENT OFFERED A JUROR A PARKING SPOT IN THE PROSECUTOR'S LOT, AND THEN HAD A FOLLOW-UP CONVERSATION WITH THE JUROR DURING A

TRIAL RECESS, THE TRIAL COURT WAS REMISS IN FAILING TO VOIR DIRE THE JUROR.

B. THE TRIAL COURT FAILED TO CONDUCT AN ADEQUATELY PROBING VOIR DIRE TO ENSURE THE JURY'S IMPARTIALITY AFTER TWO JURORS WITNESSED THE DEFENDANT'S AND THE VICTIM'S FAMILY IN A VOLATILE CONFRONTATION BEFORE THE FINAL DAY OF DELIBERATION.

POINT II - THE TRIAL COURT ERRED IN FAILING TO GIVE A THIRD CIRCUIT MODEL INSTRUCTION ON THE "CREDIBILITY OF WITNESSES — TESTIMONY OF ADDICT OR SUBSTANCE ABUSER," WHERE DEFENSE COUNSEL REQUESTED THE INSTRUCTION AND TWO OF THE CRITICAL WITNESSES ADMITTED TO BEING IMPAIRED WHEN THE RELEVANT EVENTS TOOK PLACE.

POINT III- DEFENDANT'S AGGREGATE SENTENCE OF 46 YEAR'S IMPRISONMENT SUBJECT TO NERA, CONSISTING OF TWO CONSECUTIVE SENTENCES IN VIOLATION OF STATE V. YARBOUGH, IS MANIFESTLY EXCESSIVE.

II.

Defendant raises two claims that the jury was tainted. "The Sixth Amendment of the United States Constitution and Article I, paragraph 10 of the New Jersey Constitution guarantee criminal defendants 'the right to . . . trial by an impartial jury.'" State v. R.D., 169 N.J. 551, 557 (2001) (quoting N.J. Const. art. I, ¶ 10, and citing U.S. Const. amend. VI). A defendant has "the right to have the jury decide the case based solely on the evidence presented at trial, free from the taint of outside influences and extraneous matters." Ibid.

"Once a hearing is conducted, '[a] new trial will be granted where jury misconduct or intrusion of irregular influences into the jury deliberation "could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge."'" State v. McGuire, 419 N.J. Super. 88, 154 (App. Div. 2011) (citation omitted). "'[I]f the irregular matter has that tendency on the face of it, a new trial should be granted without further inquiry as to its actual effect. The test is not whether the irregular matter actually influenced the result, but whether it had the capacity of doing so.'" R.D., supra, 169 N.J. at 558 (citation omitted).

A.

Defendant's first claim involves contact between Detective Dominic Patitucci of the Cumberland County Prosecutor's Office and an elderly man who later became a juror. According to Patitucci, in late February 2014, Patitucci saw an older gentleman having some distress walking down a hallway in the courthouse. The man was holding onto the handrail, walking very slowly and using his cane. Patitucci approached him and asked if he was okay. The issue of parking came up, and Patitucci told him "our office is pretty vacant next door" and offered him a place to park. Patitucci told him to tell the female monitoring the lot it was okay for him to park there.

Jury selection occurred on March 5-6, and the elderly man was selected as juror #11. It appears Patitucci was not present for jury selection.[1]

On March 11, trial began with opening statements. Patitucci was now in the courtroom as the case agent sitting at counsel table assisting the prosecutor. According to Patitucci, during the lunch break the juror "made eye contact like, hey, thanks. And I was like, yeah, everything good?" The juror thanked Patitucci, but said he was not using the parking lot Patitucci had offered. Instead, he said he was parking at the regular parking garage and another juror was picking him up and driving him to the courthouse door.

During the break, defense counsel raised "a secondary issue," namely that he had seen Patitucci talking with juror #11 about parking, and that "Patitucci was forthcoming" to defense counsel and confirmed they were discussing parking. Defense counsel, who had only overheard the conversation in passing, believed juror #11 and another juror were using the prosecutor's parking lot.

The trial court noted that in jury selection juror #11 had asked the court for parking accommodations, that the request had

---

[1] The prosecutor advised the potential jurors that "during the course of this trial, there'll be a detective sitting with me and assisting" named Patitucci.

"slipped my mind," and that the prosecutor's lot was not marked as such. The court asked defense counsel what he wanted the court to ask the juror. Defense counsel replied: "I don't even know if there's anything to ask him, Judge. Actually, I would just move to have him struck." When the court later said it did not "see any questions that would be asked," defense counsel reiterated: "I don't know necessarily that there's anything to question him about."

The trial court then had Patitucci take the witness stand, and Patitucci related the hallway encounter two weeks before and the contact during the break that day. The court confirmed the original encounter was before the elderly man was a juror. The court ascertained that the juror had not parked in the prosecutor's lot and that the contact during the break was just to let Patitucci know that. The court concluded it was "[m]uch ado about nothing," and did not "see any reason to disturb the matter further." The court added that "it sounds like the juror is more aware of his responsibilities then we give him credit for, in that he did not actually utilize [the lot], if he became aware that that was the Prosecutor's parking lot," but "made other arrangements, which restores our faith in the jury system."

The trial court told Patitucci that contact with the juror about parking "has to stop" and was "not going to be permitted any

further." The court made clear any parking arrangements for the juror would be made through the Sheriff's Department. The court proposed, without objection, to ask the juror at the end of the day what his arrangements were and if he needed other parking assistance from the Sheriff's Department.

As the jury was being discharged for the day, the trial court reminded juror #11 of his prior request to the court for accommodation for parking. The juror said that he had made arrangements and that one of the jurors was driving him over from the garage. The court praised such cooperation among jurors, and added that if the juror needed any other parking arrangement, he could talk to the sheriff's officer. The court then reiterated to all the jurors that "no one is permitted to talk to you outside the courtroom," that "if anyone attempts to approach you or talk to you, don't tell that to any other juror" but just to court staff, and that they should not talk about the case with anyone.

On appeal, defendant concedes "the juror did not ultimately take advantage of the complimentary parking spot." Defendant argues that "the trial court was remiss in failing to voir dire the juror."

We agree the court should have questioned juror #11 about Patitucci's offer. Even though the juror declined the offer, he still may have felt gratitude toward Patitucci, who as case agent

would be sitting next to the prosecutor. Questioning the juror would have determined what the juror felt and whether he could set his feelings aside and decide the case without bias toward either side. As the juror had just spoken about the offer to Patitucci, there was no danger that questioning would remind him of an offer he had forgotten.

"[I]f during the course of the trial it becomes apparent that a juror may have been exposed to extraneous information, the trial court must act swiftly to overcome any potential bias and to expose factors impinging on the juror's impartiality." R.D., supra, 169 N.J. at 557—58. "The court is obliged to interrogate the juror, in the presence of counsel, to determine if there is a taint[.]" Id. at 558 (citation omitted). "It is the duty of the court to ask probing questions to protect the impartiality of the jury." Id. at 563.

However, defendant never requested the trial court voir dire juror #11. To the contrary, defense counsel repeatedly told the trial court he could not think of "anything to question him about." Instead, defendant moved to strike juror #11 when he believed the juror was parking in the prosecutor's lot. After Patitucci related the juror declined the offer, defendant requested no other relief.

At the very least, defendant must show it was plain error to forego a voir dire he never requested. State v. Winder, 200 N.J.

231, 252 (2009); see, e.g., R.D., supra, 169 N.J. at 554 (finding no plain error for not questioning a juror about extraneous knowledge). "Under that [plain error] standard, defendant has the burden of proving that the error was clear and obvious and that it affected his substantial rights." State v. Morton, 155 N.J. 383, 421 (1998), cert. denied, 532 U.S. 931, 121 S. Ct. 1380, 149 L. Ed. 2d 306 (2001); accord United States v. Olano, 507 U.S. 725, 734, 113 S. Ct. 1770, 1778, 123 L. Ed. 2d 508 (1993). He must show the omission was "clearly capable of producing an unjust result." R. 2:10-2.

Defendant cannot show a basis for a new trial at this time. The situation here is unlike the circumstances in the cases cited by defendant. This case did not involve a juror who had prejudged a capital case, State v. Loftin, 191 N.J. 172, 192 (2007), a racially-biased juror, State v. Tyler, 176 N.J. 171, 182 (2003), or a juror who knew the victim and the lead witness and knew about the crime, State v. Wormley, 305 N.J. Super. 57, 68-70 (App. Div. 1997). This is not a case where the jury heard extraneous assertions of the defendant's guilt, State v. Grant, 254 N.J. Super. 571, 584-86 (App. Div. 1992), or highly inflammatory facts about the defendant's prior crimes, State v. Fortin, 178 N.J. 540, 576 (2004). Nor is this a case where the two key prosecution witnesses in a capital case were sheriffs charged with safekeeping

the jurors who had "a continuous and intimate association [with them] throughout a three-day trial."  Turner v. Louisiana, 379 U.S. 466, 473, 85 S. Ct. 546, 550, 13 L. Ed. 2d 424, 429 (1965).

This case also did not involve an attempt to influence a sitting juror on how to decide the case.  Cf. Remmer v. United States, 347 U.S. 227, 228-30, 74 S. Ct. 450, 450-52, 98 L. Ed. 654, 655-56 (1954) (remanding for a post-trial hearing where a person told a juror during trial "that he could profit by bringing in a verdict favorable to the petitioner").  In Remmer, the Supreme Court indicated that such a "private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial."  Id. at 229, 74 S. Ct. at 451, 98 L. Ed. at 656 (emphasis added); accord State v. Scherzer, 301 N.J. Super. 363, 487 (App. Div.), certif. denied, 151 N.J. 466 (1997).

"There may be cases where an intrusion should be presumed prejudicial," but this is not one of them, because it was not about the matter pending before the jury.  United States v. Olano, 507 U.S. 725, 739-41, 113 S. Ct. 1770, 1780-81, 123 L. Ed. 2d 508, 522-24 (1993) (declining to apply the Remmer presumption of prejudice to the improper presence during jury deliberations of alternate jurors); see Smith v. Phillips, 455 U.S. 209, 215-17,

12

102 S. Ct. 940, 945-46, 71 L. Ed. 2d 78, 85-86 (1982) (distinguishing Remmer's "attempted bribe, which it characterized as 'presumptively prejudicial,'" from "allegations of implied juror bias" which a defendant must prove).[2]

Here, "[t]here was no suggestion of outside influence, racial prejudice, media exposure, or any of the other sorts of irregular influences sufficient to create a potential for prejudice." Scherzer, supra, 301 N.J. Super. at 495-96. Moreover, "[t]his is a plain-error case, and it is [defendant] who must persuade the appellate court that the deviation . . . was prejudicial." Olano, supra, 507 U.S. at 741, 113 S. Ct. at 1781, 123 L. Ed. 2d at 524; see Morton, supra, 155 N.J. at 421.

The conversation two weeks before trial was an innocuous discussion about parking. See McGuire, supra, 419 N.J. Super. at 155. When Patitucci offered parking assistance to the elderly man, the man was not a juror, and neither person had any discernable reason to believe the other person would participate in defendant's future trial.

_____

[2] Indeed, "questions have arisen concerning the ongoing viability of the Remmer 'presumption.'" State v. Harris, 181 N.J. 391, 506 (2004); see, e.g., United States v. Sylvester, 143 F.3d 923, 934 (5th Cir. 1998) (holding "the Remmer presumption of prejudice cannot survive Phillips and Olano").

On the first day of trial, they had "a brief encounter" which confirmed the man had declined Patitucci's offer of parking. See Turner, supra, 379 U.S. at 473, 85 S. Ct. at 550, 13 L. Ed. 2d at 429. The trial court's instructions did not clearly proscribe it. The court told jurors not to talk about "the case," and to report if "anyone should attempt to discuss the case with you," but the juror and Patitucci did not talk about the case. The court told jurors not to speak with "any of the attorneys, the witnesses, or the defendant," but Patitucci did not fall in those categories and was not on the witness list read to the jurors. Those same limitations were implicit in the court's instruction to report "[i]f anyone should approach you or anyone attempt to talk to you," and explicit in the instruction right before the lunch break: "do not have anyone contact you about this case. If someone attempts to contact you, please let me know." Thus, the juror did not clearly violate the court's limited instructions.

This case is unlike the Iowa case on which defendant relies, State v. Carey, 165 N.W.2d 27 (Iowa 1969). There, during trial jurors were given free coffee in the jury room with a sign stating "coffee will be furnished in the jury room by the county clerk and the county attorney." Id. at 28. The bailiff testified that she purchased the coffee, that the county attorney intended to reimburse her for it, and that the sign was placed without

14

knowledge of the county attorney. Ibid. The Iowa Supreme Court did not believe "any juror here was corrupted for the price of a cup of coffee, but was concerned with the "appearance" to the jurors and to the public, that the prosecutor intentionally gave a gift to sitting jurors. Id. at 29-30. "The effect upon the jurors and upon any member of the public . . . was the same as if it" was "an intentional attempt to secure favor with those persons who were even then in the process of passing upon . . . guilt or innocence." Id. at 30.

By contrast, Patitucci's offer of parking assistance did not have that appearance. Most importantly, when Patitucci offered parking assistance to the elderly man, the man was not a sitting juror, trial and jury selection had not even commenced, and neither had any idea that the man would become a juror in defendant's trial. Moreover, unlike the sign in Carey, Patitucci did not seek credit for the prosecutor. See State v. Lampman, 342 N.W.2d 77, 80 (Iowa Ct. App. 1982) (distinguishing Carey where the jurors got coffee from the prosecutor's office where donations were accepted). Indeed, as the trial court noted, there was no evidence the elderly man knew this unknown detective was offering parking in the prosecutor's lot; the man also did not know Patitucci was the prosecutor's case agent until trial began. See also State v. Le Grand, 442 N.W.2d 614, 616 (Iowa Ct. App. 1989) (distinguishing

*Carey* where jurors received transportation assistance from sheriffs who were not witnesses and did not discuss the case with the jurors). In any event, *Carey* did "not decide whether [the offer] alone, without more, would be sufficient to require a new trial," *Carey*, *supra*, 165 N.W.2d at 30, so defendant "read[s] more into *Carey* than [the Iowa Supreme Court] intended," State v. Cullen, 357 N.W.2d 24, 28 (Iowa 1984).

We also find guidance from the United States Supreme Court's decision in *Phillips*, *supra*. In *Phillips*, a juror "submitted during the trial an application for employment as a major felony investigator in the District Attorney's Office." 455 U.S. at 209, 212, 102 S. Ct. at 943, 71 L. Ed. 2d at 83. When that information was revealed to the defense after trial, the trial court held a hearing at which the juror testified; it found the juror was not prejudiced and was able to consider the guilt or innocence of the defendant solely on the evidence. Id. at 213-14, 102 S. Ct. at 944, 71 L. Ed. 2d at 84.

The United States Supreme Court emphasized "that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." Id. at 215, 102 S. Ct. at 945, 71 L. Ed. 2d at 85. The Court stressed "that due process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that

16                                                    A-1811-14T3

the rule, few trials would be constitutionally acceptable."  Id. at 217, 102 S. Ct. at 946, 71 L. Ed. 2d at 86.  The Court observed "it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote," and held determinations of "the effect of such occurrences . . . may properly be made at a hearing like that ordered in Remmer and held in this case."  Ibid.

The reasoning of the United States Supreme Court in Smith has been adopted by our Supreme Court and this court.  E.g., R.D., supra, 169 N.J. at 559; McGuire, supra, 419 N.J. Super. at 154; State v. Dreher, 302 N.J. Super. 408, 501 (App. Div. 1997).  We have followed Smith and held a "post-conviction hearing conducted by the [trial] court [i]s adequate to determine that the juror was not biased and the verdict was based exclusively on the evidence." State v. Bisaccia, 319 N.J. Super. 1, 17 (App. Div. 1999).

Under the circumstances here, while the trial court "erred in not conducting" further voir dire of Juror #11, "[w]e believe that the interests of justice will best be served by now having the trial judge conduct the hearing" as opposed to "automatically [granting] a new trial."  See State v. Kelly, 61 N.J. 283, 294 (1972); see, e.g., State v. Stubbs, 433 N.J. Super. 273, 289 (App. Div. 2013); State v. Scott, 398 N.J. Super. 142, 154 (App. Div. 2006).

The trial court shall hold the hearing at which Juror #11 is questioned within thirty-five days, and make findings promptly thereafter on the facts concerning the communications between Patitucci and juror #11, the effect of those communications on juror #11, and what if anything juror #11 conveyed to the other jurors concerning those communications. Defendant shall have "the opportunity to prove actual bias" on the part of Juror #11 or any juror due to the communications. Phillips, supra, 455 U.S. at 215, 102 S. Ct. at 945, 71 L. Ed. 2d at 85. "That determination requires the trial court to consider the gravity of the extraneous information in relation to the case, the demeanor and credibility of the juror or jurors who were exposed to the extraneous information, and the overall impact of the matter on the fairness of the proceedings." R.D., supra, 169 N.J. at 559.[3]

## B.

After the first day of jury deliberations, there was a confrontation between members of the families of the victim and defendant in front of the courthouse. Two jurors witnessed it

---

[3] If juror #11 cannot be found or is otherwise unable to testify about the communications, the court shall make findings on the timing and nature of the juror's unavailability, and on whether defense counsel's statements that he could not think of anything to question the juror about caused the court to forego questioning the juror prior to his unavailability. See State v. Jenkins, 178 N.J. 347, 359 (2004).

while waiting for their rides, and reported it to the trial court. The court conducted a voir dire of the two jurors.

Juror #4 informed the trial court that she witnessed the "confrontation," that the family members were "cursing" each other and "acting disrespecting," and that she felt "uncomfortable." She told the court that she could continue to serve as a juror: "Oh, yes. That does not bother me. It was not directed at me." Juror #6 also witnessed the confrontation, that it consisted of "a girl and a dude" exchanging "not friendly eye contact," and saying "uh-huh" and "yeah" to each other, a verbal altercation, and that no one else reacted. Juror #6 said he "got disturbed," but "could understand" that "they both kind of went a little overboard," and that it was not directed at him. He felt he could still deliberate in the case, and he had no other concerns. Both jurors said they did not discuss the confrontation with any other jurors.

The trial court found that neither juror "expressed anything that [would] . . . impact . . . on their ability to deliberate" and that no further questioning was required. The court found that juror #4 "indicated that she clearly could separate" the families' emotional reactions from "her obligations as a juror," and that juror #6's "words were of the same ilk." The court found the confrontation did not have "any effect on either of their

19

abilities to deliberate." The court instructed the two jurors not to speak to the other jurors about the confrontation, assured them security had been increased, ordered the family members involved in the confrontation removed from the courthouse, and warned the remaining family members against any future incidents.

On appeal, defendant argues the trial court failed to conduct an adequately probing voir dire of jurors #4 and #6. However, at trial defendant never suggested additional voir dire was needed of those jurors. When the trial court proposed questioning them, defense counsel said "I have no problem with the voir dire as we discussed" and he had "[n]othing at this time" to add. Defense counsel asked juror #4 a question, and did not criticize the voir dire. At the conclusion of the voir dire of the two jurors, defense counsel stated: "We've heard their questioning. That's fine. But I think both of them were pretty clear" that they saw discord between the families. Defendant objected to the two jurors continuing to deliberate, but never asked that they be questioned further. Thus, defendant must show plain error.

Even if defendant now "would have preferred further inquiry of the [two] juror[s]," "the trial court's failure to do so did not constitute plain error." R.D., supra, 169 N.J. at 563. Defendant does not show that further inquiry would have produced a different outcome. He hypothesizes the jurors may have heard

information about the case, but the two jurors said the feuding family members were merely cursing, disrespecting, and saying "'uh-huh, yeah' to each other." Defendant argues the jurors could have identified the feuding family members, but the court properly relied on the sheriff's officer who witnessed the confrontation to make such identifications, rather than put that burden on the jurors.

Moreover, "[u]nder R.D., the overarching relevant inquiry is not whether the trial court committed error, but whether it abused its discretion." State v. Wakefield, 190 N.J. 397, 496 (2007). "That is so because '[a]pplication of that standard respects the trial court's unique perspective [and appellate courts] traditionally have accorded trial courts deference in exercising control over matters pertaining to the jury.'" Id. at 497 (quoting R.D., supra, 169 N.J. at 559-60). "Ultimately, the trial court is in the best position to determine whether the jury has been tainted." R.D., supra, 169 N.J. at 559 (citation omitted).

"That determination requires the trial court to consider the gravity of the extraneous information in relation to the case, the demeanor and credibility of the juror or jurors who were exposed to the extraneous information, and the overall impact of the matter on the fairness of the proceedings." Ibid. Here, the trial court's questioning elicited both jurors' description of what they

saw and heard, its impact on them, their belief they still could fairly deliberate, and their assurance they had not discussed the confrontation with the other jurors. The court did not abuse its discretion in finding no "further action has to be taken with regard to those two jurors."

"The appellate standard for reviewing a voir dire procedure is whether, despite the trial court's efforts, there still existed a 'realistic likelihood of prejudice.'" State v. Harvey, 151 N.J. 117, 211 (1997) (citation omitted). We agree with the trial court that there was no realistic likelihood of prejudice from the confrontation. In a murder trial, it is unsurprising that there is animosity between the family of the defendant and the family of the victim. "The outburst contained no factual information that could have influenced the jury." State v. Wilson, 335 N.J. Super. 359, 368-69 (App. Div. 1999) (finding the jury could disregard "an emotional outburst by the victim's mother" who "suddenly screamed and began sobbing"), aff'd o.b., 165 N.J. 657, 659 (2000). After voir dire, the trial court found both jurors could impartially deliberate despite witnessing the confrontation. "[A]n appellate court should show appropriate deference to the trial court's assessment of 'matters of credibility, judgment and discretion which should not ordinarily be disturbed on appeal.'" Harvey, supra, 151 N.J. at 211 (citation omitted).

The trial court also found "no indication that any of this information was passed to any of the other jurors." The court asked counsel if there was a need to question the other jurors. Defense counsel, who left the courthouse before the confrontation and did not hear anything, noted that alternate juror #7 left at the same time so "I don't think that's an issue." Counsel added that juror #3 may not have gone "out the door the same time as me," but counsel could not say juror #3 saw the confrontation, and admitted he "might have the wrong number." The court concluded it was "not going to involve the other jurors now, because neither of the jurors who did report it indicated any other juror was present. And no other jurors reported anything," which they would have to do under the court's prior instructions. The sheriff's officer similarly said only jurors #4 and #6 witnessed the confrontation.

"[T]he decision to voir dire individually the other members of the jury best remains a matter for the sound discretion of the trial court. No per se rule should obtain." R.D., supra, 169 N.J. at 561. "[T]he court's own thorough inquiry of the [questioned] juror should answer the question whether additional voir dire is necessary to assure that impermissible tainting of the other jurors did not occur." Ibid. Moreover, it may "be more

harmful to voir dire the remaining jurors because, in asking questions, inappropriate information could be imparted." Ibid.

Here, multiple sources stated that only jurors #4 and #6 saw the confrontation, and defendant presented no evidence to the contrary. The confrontation happened after the jury had dispersed for the evening, and the court questioned jurors #4 and #6 first thing the next morning, so they had little or "no opportunity to communicate impermissible information to [their] fellow jurors," and they "denied communicating [their] knowledge to other jurors." Id. at 562. Given the court's instructions to all jurors to report such incidents and not to communicate about the case, and the instruction's effectiveness as demonstrated by jurors #4 and #6, the court could assume the other jurors would have reported if they had seen or heard anything. Ibid.; see State v. T.J.M., 220 N.J. 220, 237 (2015) ("We act on the belief and expectation that jurors will follow the instructions given them by the court."). Thus, as in R.D., supra, "[t]he trial court did not abuse its discretion in not questioning the remaining jurors." 169 N.J. at 562.

### III.

At the jury charge conference, defense counsel said "we requested — we offered a Third Circuit model jury charge in regards to witnesses with drug issues." The trial court found it did not

have a copy of the Third Circuit instruction, and defense counsel responded "Judge, I will get you another copy[.]" The court replied: "If you want to submit that, I'll consider it but I don't have anything to consider yet because I don't have it. Get it to me tomorrow, Counsel." Defense counsel said he would email it, but defendant has not shown that he ever provided the Third Circuit instruction to the trial judge nor did his attorney ever mention it again. At the final jury charge conference, when the court asked for any further objections to the charge, defense counsel replied, "[n]othing from me." After the court gave its charge, it asked if counsel had any questions, and defense counsel said "no" and made no objection.

A party seeking an instruction must "make requests to charge in a format suitable for ready preparation and submission to the jury," and provide copies. R. 1:8-7(b). As defendant did not supply a copy of the Third Circuit instruction or request a final ruling, it was not error for the court not to rule on that instruction. "The court's failure to rule explicitly on each request will not be reversible error if the party did not request a ruling and was not prejudiced by the omission." Pressler & Verniero, Current N.J. Court Rules, comment 3.2 on R. 1:8-7 (2018). Moreover, "if a party submitting a request to charge fails to object to its omission from the charge as given, review on appeal

will be subject to the plain error standard." Ibid. (citing Dynasty, Inc. v. Princeton Ins. Co., 165 N.J. 1, 17-18 (2000)); see R. 1:7-2, 2:10-2.

Defendant cannot show plain error. Neither the Third Circuit's instruction nor its "care and caution" requirement have been accepted by the New Jersey courts. An error is "'plain'" only if "the error is clear under current law." Olano, supra, 507 U.S. at 734, 113 S. Ct. at 1777, 123 L. Ed. 2d at 519.

In any event, defendant cannot show prejudice. The instruction provides that if a witness was using drugs, addicted to drugs, or abusing alcohol when the events took place, his or her testimony "must be considered with care and caution," and "may be less believable, because of the effect the [drugs or alcohol] may have on [his or her] ability to perceive, remember, or relate the events in question," but that the jury "may give it whatever weight if any, [it] find[s] it deserves."

However, the trial court's instructions adequately covered this area. The trial court instructed the jury with a tailored version of the New Jersey Model Criminal Jury Charge on credibility of witnesses.[4] The court instructed that "in determining the credibility of witnesses," the jury could consider "the witness's

[4] Model Jury Charge (Criminal), Criminal Final Charge — Credibility of Witnesses (revised February 24, 2003).

power of discernment," "his or her ability to reason, observe, recollect, or relate," "and any or all other matters in the evidence which may serve to support or discredit his or her testimony." The court also instructed the jury that it should "weigh the testimony of each witness and then determine the weight to be given to it." Those instructions were sufficient to allow the jury to consider the effect of Wright's prior drug use and Barrick's alcohol consumption on their ability to perceive, remember, and relate the facts, and to weigh their testimony accordingly. Indeed, defense counsel argued to the jury not to "put a lot of faith in the words of someone who is an admitted crack user."

Further, regarding the key part of Barrick's testimony relating defendant's oral statements, the court instructed the jury that it should "receive, weigh and consider this evidence with caution," citing the "risk of misunderstanding by the hearer or the ability of the hearer to recall accurately the words used by the Defendant." The court also instructed the jury to consider Wright's prior convictions "in determining the credibility or believability of the witness'[s] testimony."

Thus, the general instructions regarding credibility of witnesses were sufficient to charge the jury. The court's failure to give the requested Third Circuit instruction was not plain

27

error.  See State v. Swint, 328 N.J. Super. 236, 259 (App. Div. 2000) (finding no error where the court failed to give specific instructions because the court gave the general charge on credibility).

## IV.

Finally, defendant challenges his sentence.  "Appellate review of sentencing is deferential, and appellate courts are cautioned not to substitute their judgment for those of our sentencing courts."  State v. Case, 220 N.J. 49, 65 (2014). Disturbing a sentence is permissible in only three situations: "(1) the trial court failed to follow the sentencing guidelines, (2) the aggravating and mitigating factors found by the trial court are not supported by the record, or (3) application of the guidelines renders a specific sentence clearly unreasonable." State v. Carey, 168 N.J. 413, 430 (2001).  We must hew to our deferential standard of review.

The court sentenced defendant to twenty-eight years in prison for aggravated manslaughter.  The court also sentenced defendant to eighteen years in prison for armed robbery, and nine years in prison for burglary, to run concurrently with each other but consecutively to the manslaughter sentence.  All those sentences were subject to NERA's 85% parole ineligibility.  The court merged the possession of a weapon for an unlawful purpose charge into the

28

robbery conviction, and sentenced defendant to nine years in prison for unlawful possession of a weapon with four-and-one-half years of parole ineligibility, and nine years in prison for certain persons not to have weapons with five years of parole ineligibility, both to run concurrent with the manslaughter sentence.

First, defendant argues the trial court erred in imposing consecutive sentences. Our Supreme Court has adopted "criteria as general sentencing guidelines for concurrent or consecutive-sentencing decisions." State v. Yarbough, 100 N.J. 627, 644 (1985), cert. denied, 475 U.S. 1014, 106 S. Ct. 1193, 89 L. Ed. 2d 308 (1986). The Court listed the following relevant criteria:

> (1) there can be no free crimes in a system for which the punishment shall fit the crime;
>
> . . . .
>
> (3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not
>
>> (a) the crimes and their objectives were predominantly independent of each other;
>>
>> (b) the crimes involved separate acts of violence or threats of violence;
>>
>> (c) the crimes were committed at different times or separate

> > places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
>
> > (d) any of the crimes involved multiple victims; [and]
>
> > (e) the convictions for which the sentences are to be imposed are numerous[.]
>
> [Ibid.][5]

The trial court here considered the Yarbough factors, and acknowledged that most favored concurrent sentences. The aggravated manslaughter, burglary, and robbery all occurred in the matter of a few minutes and all in Valentin's home. Defendant and Allison entered Valentin's home with the objective of taking her drugs and money by threatening her with the gun. There was no indication of an independent objective to kill Valentin. The only threat and act of violence was defendant pointing the gun at

---

[5] Yarbough, supra, originally had a sixth guideline, namely "there should be an overall outer limit on the cumulation of consecutive sentences for multiple offenses not to exceed the sum of the longest terms (including an extended term, if eligible) that could be imposed for the two most serious offenses." 106 N.J. at 644. After Yarbough, "the Legislature amended N.J.S.A. 2C:44-5a to provide that '[t]here shall be no overall outer limit on the cumulation of consecutive sentences,' thereby eliminating guideline number six." Carey, supra, 168 N.J. at 423 (quoting L. 1993, c. 223, § 1).

30                                                          A-1811-14T3

Valentin and firing the shot that killed her. The court acknowledged that all of the crimes "involved the same victim."

However, <u>Yarbough</u>'s third guideline "should be applied qualitatively, not quantitatively." <u>Carey</u>, <u>supra</u>, 168 <u>N.J.</u> at 427. Accordingly, "a sentencing court may impose consecutive sentences even though a majority of the <u>Yarbough</u> factors support concurrent sentences." <u>Id.</u> at 427—28 (citing <u>State v. Perry</u>, 124 <u>N.J.</u> 128, 177 (1991) (finding consecutive sentences proper even though four of <u>Yarbough</u>'s five factors favored concurrent sentences)).

Defendant argued the <u>Yarbough</u> factors unanimously weigh in favor of concurrent sentences. However, "[t]he fifth factor — 'whether there are numerous convictions' — provides some support for consecutive sentences because defendant's [six] convictions" fall within "the 'numerous' range." <u>Carey</u>, <u>supra</u>, 168 <u>N.J.</u> at 424 (finding four convictions approached the "numerous" range). Moreover, the trial court referenced <u>Yarbough</u>'s guidance that there are to be no free crimes, which "tilts in the direction of consecutive sentences because the Code focuses on the crime, not the criminal." <u>Id.</u> at 423.

Defendant alternatively argues that a remand is necessary to allow the court to consider the <u>Yarbough</u> factors without its

misapprehension about the relevance of the jury's acquittal on the felony murder charges."  We agree.

The trial court focused on the effect of the jury's decision to decline to convict defendant of felony murder and to convict him of the lesser offense of aggravated manslaughter.  The court queried whether "the jury separate[d] the homicide from the underlying offenses."  The court stated that "[h]ad the jury convicted the defendant of felony murder, the underlying offenses of robbery and burglary would . . . merge into felony murder.  But the jury's verdict speaks to a different result."  The court concluded that defendant's "aggravated manslaughter is . . . separate and distinct from the offenses of robbery and burglary."

Although the jury's verdict reduced the maximum term available for the homicide while removing the basis for merger of robbery and burglary, those legal consequences do not alter the inquiry under Yarbough, which focuses on the "facts relating to the crimes, including whether or not . . . the crimes and their objectives were predominantly independent of each other."  Id. at 644 (emphasis added); see Carey, supra, 168 N.J. at 433.  Here, the facts prevent such a conclusion.

As the trial court noted, the facts indicated defendant "cause[d] the death of" Valentin "in the course of" "the commission of, or the attempt to commit," burglary and robbery, and thus

32

committed felony murder. <u>N.J.S.A.</u> 2C:11-3(a)(3). "[E]ven if the jury found that defendant fired the gun recklessly without intending to shoot the victim, it still would have been required to find him guilty of felony murder." <u>State v. Pennington</u>, 273 <u>N.J. Super.</u> 289, 299 (App. Div. 1994) (citation omitted). The jury's unexplained decision to convict him instead of aggravated manslaughter did not change the facts.[6]

Our Supreme Court has stated the governing principles. "We accept inconsistent verdicts in our criminal justice system, understanding that jury verdicts may result from lenity, compromise, or even mistake. We therefore must resist the temptation to speculate on how the jury arrived at a verdict." <u>State v. Goodwin</u>, 224 <u>N.J.</u> 102, 116 (2016) (citations omitted). "Our jurisprudence does not allow us to conjecture" or to "attempt to reconcile the counts on which the jury returned a verdict of guilty and not guilty." <u>State v. Muhammad</u>, 182 <u>N.J.</u> 551, 578 (2005).

The trial court inappropriately considered the effect of the jury's acquittal of felony murder in finding the aggravated manslaughter conviction to be predominantly independent of the burglary and robbery. Therefore, we vacate the consecutive nature

---

[6] The trial court did not assert the mens rea for aggravated manslaughter made it independent of robbery and burglary.

of the sentences on the burglary and robbery counts and remand for consideration whether any of defendant's sentences should be imposed consecutively. We express no opinion on whether consecutive sentences can be imposed on the robbery or burglary convictions on some other basis.[7]

Defendant also argues the aggravating factors found here do not support the individual sentences near the top of the range, which he contends are manifestly excessive. We disagree.

The trial court's finding of aggravating factors three, six, and nine was supported by the evidence. Defendant does not dispute that his juvenile record consists of eleven adjudications for burglary, conspiracy to commit robbery, and other offenses, and three violations of juvenile probation. As an adult, his record included three indictable convictions for burglary and defiant trespass, thirteen disorderly person convictions, one violation of probation, and one parole violation. Defendant's prior criminal

---

[7] See State v. Koskovich, 168 N.J. 448, 533 (2001) (finding "the robberies and killings were not so intertwined that the court should have imposed concurrent sentences"); State v. Mejia, 141 N.J. 475, 504 (1995) (finding that "[a]lthough the victim in both [the murder and robbery] offenses was the same, the crimes were separate"); see also State v. Walker, 322 N.J. Super. 535, 540, 557 (App. Div.), certif. denied, 162 N.J. 489 (1999); State v. Adams, 320 N.J. Super. 360, 370 (App. Div.), certif. denied, 161 N.J. 333 (1999).

record, and current offense justified finding these aggravating factors.

Defendant argues the trial court erred in assessing these aggravating factors as they all related to "one aspect" of his background. However,

> implicit in a sentencing court's assessment of [aggravating factors 3, 6, and 9] is a qualitative assessment that we want and expect the court to make. A court's findings assessing the seriousness of a criminal record, the predictive assessment of chances of recidivism, and the need to deter the defendant and others from criminal activity, do all relate to recidivism, but also involve determinations that go beyond the simple finding of a criminal history and include an evaluation and judgment about the individual in light of his or her history.
>
> [State v. Thomas, 188 N.J. 137, 153 (2006).]

Thus, the trial court properly found not only that defendant had an extensive criminal history, but also that his repeated failure to conform his conduct to the law over the course of his lifetime despite numerous terms of incarceration and probation provided ample support for the court's finding that he was likely to reoffend and needed to be specifically deterred. The court properly gave substantial weight to all three aggravating factors, which substantially outweighed the non-existent mitigating factors. Given those findings, the court's sentences on the individual counts were not manifestly excessive.

We remand for a hearing on juror #11. The trial court shall conduct the hearing within thirty-five days of the date of this opinion and shall issue its oral or written opinion making the requisite findings promptly thereafter. The parties shall file simultaneous briefs in this court twenty-one days after the court issues its opinion, which defendant shall supply to this court. We retain jurisdiction, and will consider the effect of those findings on the convictions and issue a supplemental opinion.

To avoid delay and premature proceedings, any resentencing based on our vacating of the consecutive nature of the sentences for robbery and burglary shall await issuance of our supplemental opinion.

Vacated in part, and remanded. We retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1811-14T3